UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Mercedes Petitfere, U.S. Navy<br>7008 Courthouse Commons Blvd.<br>Spotsylvania, VA 22553<br>United States<br><br>   Plaintiff<br><br><br>  v.<br><br><br>The Honorable Lloyd J. Austin III<br>Secretary of Defense<br>1000 Defense Pentagon<br>Washington, DC 20310-1000<br><br>   Defendants | Case No.: 1:22-cv-1819<br><br>COMPLAINT FOR VACATING OF UNLAWFUL AGENCY DECISION UNDER THE ADMINISTRATIVE PROCEDURE ACT |

**COMPLAINT FOR VACATING OF UNLAWFUL AGENCY DECISION UNDER THE ADMINISTRATIVE PROCEDURE ACT**

Plaintiff Lieutenant Mercedes Petitfrere ("Plaintiff") was pregnant for the first time in late 2018, and the pregnancy had progressed normally. However, things took a drastic turn for the worst on December 17th, 2018. She experienced excruciating abdominal pain and sought help from the Navy Medical Center at Camp Lejeune ("NMCCL"). Instead, NMCCL personnel ignored her complaints, including on a second visit two days later on the 19th, and blithely stuck to their cursory assessment that it was just normal pain caused by fibroids during pregnancy. They even insulted her by asking who had told her that it was a good idea to become pregnant while she had fibroids. Now facing truly unbearable pain and contractions, on the morning of the 20th her husband took her to a civilian hospital. Tragically, a few short hours later, her first child was delivered stillborn.

Case 1:22-cv-01819   Document 1   Filed 06/24/22   Page 2 of 12

An expert opinion by a doctor who specialized in obstetrics, with 35 years of experience, found that NMCCL medical personnel had failed to perform *any* of the required elements of the standard of care for a patient showing her risk factors and symptoms. In his opinion, had the standard of care been followed, it was likely that Plaintiff would have been able to viably carry her firstborn to term. Plaintiff filed her claim for medical malpractice with the Department of Defense, pursuant to the terms of the 2019 National Defense Authorization Act, establishing a procedure for such claims. In return she received a final insult to compliment the previous injuries caused by the negligence of Department of Defense medical personnel. The Department of Defense returned a cursory and boilerplate rejection, adopted on appeal.

Plaintiff now comes before this Court to vacate that decision as unlawful under the Administrative Procedures Act, and Supreme Court precedent in *Accardi*'s, requirement that agencies observe procedure required by law and follow their own regulations. The Department of Defense's cursory and boilerplate rejection was in violation of its regulatory duty to provide a brief explanation sufficient to permit a meaningful response on appeal. This Court should vacate the Initial Determination, and its upholding on appeal, and remand this matter for a new Determination, so that some salve may finally be applied to the wound inflicted to Plaintiff by the negligence of the Department of Defense's medical personnel.

I.   **JURISDICTION AND VENUE**

1. This court has jurisdiction pursuant to 28 U.S.C. § 1331, as this is a civil action arising under the laws of the United States.

2. The Acts of Congress upon which federal question jurisdiction rests are 10 U.S.C. § 2733a, which permits servicemembers to file suit against the Department of Defense for claims of medical malpractice and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, which, under the Supreme Court's *Accardi* doctrine, permits the review of even normally nonreviewable decisions when an agency has not followed its own statutes. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954); *See, e.g. Montilla v. I.N.S.*, 926 F.2d 162, 166 (2nd Cir. 1991).

3. Venue in this district is proper pursuant to 28 U.S.C. § 1391(e)(1) and 5 U.S.C. § 703.

## II. THE PARTIES

4. Plaintiff Lieutenant Mercedes Petitfrere, USN, is a member of the United States Navy Chaplain Corps.

5. Defendant the Honorable Lloyd J. Austin, III, is being named in his official capacity as the Secretary of Defense, overseeing not only the Department of the Navy, but also the Defense Health Agency ("DHA").

## III. STATEMENT OF THE FACTS

**The events of December 17th through December 20th, resulting in the stillbirth of Plaintiff's first child, after Navy Medical Center Camp Lejeune personnel ignored her complaints and statements as to what she was experiencing.**

6. Plaintiff became pregnant around August of 2018.

7. At the time of her pregnancy, she was stationed at Camp Lejeune, in North Carolina.

8. Her pregnancy progressed normally until December of 2018. Exhibit 1, Expert Opinion of Dr. James Wheeler at 7.

9. On December 17, 2018, Plaintiff experienced significant abdominal pain and cramping, as well as painful urination, after a long weekend trip, and went to Naval Medical Center Camp Lejeune ("NMCCL").

10. The midwife, upon noticing that her chart mentioned that Plaintiff had been diagnosed with fibroids, instantly advised her, without further investigation, that the pain was due to fibroids.

11. This was despite Plaintiff noting that she had had fibroids for quite some time, and that they were very small and never caused her pain.

12. The midwife reiterated her cursory diagnosis that it was fibroids, and prescribed Tylenol.

13. Plaintiff once again noted the severity of her pain, but she was waved off and told that fibroid pain was normal during pregnancy.

14. She was discharged an hour later.

15. The pain continued to get worse, and she tried to power through it on December 18th, due to the assurances by the nurse that the pain was normal and her baby was fine.

16. By December 19th, the pain had become excruciating, and she called NMCCL in the morning to inform them that the pain had increased, but she was informed that increased pain does not constitute a worsened condition and that they would likely just reiterate their diagnosis and send her back home if she came in.

17. Later on the 19th Plaintiff noticed that she was bleeding vaginally and reported to the NMCCL emergency room where she complained of her severe abdominal pain.

18. She was taken to labor and delivery, where she was again told that it was fibroids, despite the bleeding.

19. The OB/GYN examined Plaintiff and told her that, as a black woman who had fibroids, the pain was not uncommon and the baby was fine.

20. Plaintiff tried to communicate how horrible the pain was becoming, and even stated that the remainder of her pregnancy may become unbearable if what the OB/GYN said was true and that this was just normal pain related to her fibroids.

21. The OB/GYN denied Plaintiff's request for a different medication besides the low dosage Tylenol on the grounds that there was an opioid crisis in the military, despite Plaintiff having zero history of substance abuse and her posing zero risk in that regard.

22. The OB/GYN even stunningly and unprofessionally asked Plaintiff who told her it was a good idea to become pregnant with fibroids.

23. The OB/GYN stated that, if Plaintiff wanted stronger medication, she would have to schedule a consultation with someone in maternal/fetal medicine on Monday, December 24th, 2018.

24. Due to the severity of the pain she was suffering from, Plaintiff could not wait five days for a consultation, and instead begged medical staff to give her stronger pain meds intravenously than the Tylenol she had been previously prescribed.

25. The OB/GYN reluctantly agreed, and gave her IV Tylenol, which allowed her to remain in the hospital a little bit longer to receive it, but the OB/GYN was unwilling to keep the patient overnight, even though Plaintiff had requested it.

26. The medical staff were treating her as a nuisance, due to her complaints as to the pain she was suffering from.

27. The nurse who intravenously administered the pain medication, acetaminophen, was visibly annoyed with Plaintiff's multiple requests and she handled her so roughly in the IV administrative of the medication that she blew the veins in the Plaintiff's hands, causing her to cry.

28. Plaintiff was experiencing contractions and expressed this to the medical staff, who ignored what she was telling them.

29. They had assessed that she was just another black woman suffering from fibroid pain and nothing was going to change that assessment.

30. Plaintiff went home and spent the night writhing in pain, mentally preparing for the rest of her pregnancy to be like this.

31. The morning of the 20th, Plaintiff was determined to go to work, to try and establish the new normal of what the remainder of the pregnancy was going to be like.

32. She was unable to do so, as the pain was so horrible that she was unable to walk or stand up straight, and she was barely able to speak.

33. Due to the way in which the NMCCL staff had ignored her and what she was telling them before, Mr. Petitfrere instead took Plaintiff to the civilian Onslow Memorial Hospital.

34. When she arrived she was in such pain that she was simply screaming and crying for help.

35. She was given an ultrasound, and Onslow medical staff were concerned by the results, though they did not make formal comments to the Petitfreres.

36. The records show that the ultrasound revealed that Plaintiff's cervix was completely dilated with a bulging bag of water and a live fetus.

37. Less than an hour later, Plaintiff's water broke and the medical staff prepared her for labor.

38. The Petitfere's son, Primas Petitfere, was tragically stillborn shortly after at 10:59 a.m. on the 20th, less than 14 hours after she had been discharged from the NMCCL the night before on the 19th.

39. During an outpatient follow up at the NMCCL Obstetric Clinic with Dr. Younger on December 31, 2018, Dr. Younger noted that there was fetal culture showing *Streptococcus Bovis*, pointing, in their opinion, to potential infection leading to a cascade event causing preterm labor and delivery. Exhibit 1, Expert Opinion of Dr. Jim Wheeler dated February 22nd, 2022 at 8-9.

40. Stunningly, on January 9th, 2019, Dr. Friski instead returned to the NMCCL's *idee fixe*, fibroids, and assessed that the preterm birth had been caused by placental abruption, potentially from distorted uterine anatomy caused by fibroids, leading to preterm labor. *Id.* at 9.

41. Plaintiff had two subsequent successful pregnancies, both aided through the use of progesterone, which quiets the irritability and contractility of the uterus. *Id.* at 13.

42. Plaintiff is also currently pregnant and in the second trimester with her 4th child.

43. Plaintiff never required surgery to remove her small and few fibroids, nor was it ever raised as an option necessary to promote a healthy pregnancy. *Id.*

**The Expert Medical Opinion of Dr. Jim Wheeler finding that the Navy Medical Center Camp Lejeune medical personnel had violated the standard of care.**

44. Plaintiff's medical records were examined by Dr. Jim Wheeler, a Baylor College of Medicine and Yale University School of Medicine trained physician with 40 years of experience and an expertise in Obstetrics and Gynecology. *Id.* at 2-3.

45. He is also an attorney, graduating from the University of Houston Law Center in 2005 with a J.D. and passing the Texas Bar, to which he remains a member, though he has never practiced. *Id.* at 4.

46. He continues to practice medicine full time. *Id.*

47. As a practitioner who was treating obstetric patients in 2018 and continues to do so to the present, he was familiar with the accepted medical stands of care for patients like Plaintiff and was qualified to assess whether Plaintiff's treatment at the NMCCL met those standards. *Id.* at 4-5.

48. He offered his assessment based on his 35 years of experience in Obstetrics at the time of the writing of his expert opinion. *Id.* at 5.

49. He began by stating that Plaintiff showed clear signs of being at clinical risk for preterm labor, including cramping, back ache, irregular contractions, and vaginal bleeding. *Id.* at 11.

50. He then laid out the six steps which are normally performed when doing an initial evaluation of a woman with suspected preterm labor. *Id.* at 11-12.

51. He noted that *none of the methods* for assessing preterm labor were performed on either December 17th, or December 19th. *Id.*

52. Nor was the normal recommended four to six hours of observation for women with signs and symptoms of preterm labor, such as those shown by Plaintiff, observed. *Id.* at 12.

53. He continued by stating that Dr. Friski's assessment of placental abruption was a near impossibility, as the placenta took over two hours to separate. *Id.* at 12.

54. Dr. Younger's assessment that the preterm delivery had been caused by infection was similarly extremely improbably, given that *Streptococcus Bovis* is not associated with causing preterm labor, and that Plaintiff was not showing a fever on either December 17th or 19th. *Id.*

55. Given the unlikeliness of the proffered reasons for the stillbirth of Primas, and the success of progesterone in ensuring two successful pregnancies, Dr. Wheeler's expert opinion was that the preterm labor had been caused by the increased contractility of her uterus. *Id.* at 14.

56. Dr. Wheeler's expert opinion was that the standard of care required of NMCCL medical staff on December 19th was to:
    a. Recognize her risk factors for preterm labor;
    b. Recognize her symptoms compatible with preterm labor;
    c. Identify her physical signs compatible with preterm labor, including uterine firmness/tenderness, and palpable cervicle changes;
    d. Recognize the sonographic signs compatible with preterm labor, including the sufficient-to-be-recorded shortening and funneling of the cervix;
    e. Identify uterine contractions by uterine palpation or via electronic monitoring;
    f. Follow the fetal heart rate pattern via electronic fetal monitoring ("EFM");
    g. Obtaining a fetal fibronectin test;
    h. Obtaining a urine culture in a patient who had complained of dysuria two days prior on the 17th.
    i. Observe Plaintiff for the recommended 4-6 hours for evidence of progressive symptoms and signs of preterm labor;
    j. Pending urine culture, and during observation, administer antibiotics to cover the clinical probability of urinary tract infection, and actual diagnosis of vaginal infection. *Id.* at 14-5.

57. NMCCL medical staff failed to meet *any* of the required elements of the standard of care. *Id.* at 16-7.

58. In Dr. Wheeler's expert opinion, the negligence of NMCCL medical staff was the proximate cause of Primas' tragic stillbirth, and that, but for their negligence, it was probable that Plaintiff would have been able to carry Primas to a viable birth. *Id.* at 18.

**Plaintiff's claim to the Department of Defense for medical malpractice, and the Defense Health Agency's cursory and boilerplate response, adopted by the appellate board.**

59. Plaintiff filed, through counsel, her claim, J210395, against the Department of Defense for medical malpractice on December 17th, 2020, though the Defense Health Agency claimed that the claim was filed on December 30th, 2020.

60. There was no final action at the time, as the Defense Health Agency was still implementing regulations to govern the adjudication of medical malpractice claims.

61. The carving out of an exception to the *Feres* doctrine to permit medical malpractice claims by service members against the military was a product of the SFC Richard Stayskal Military Medical Accountability Act of 2019, implemented as part of the passing of the 2019 National Defense Authorization Act. *See* SFC Richard Stayskal Military Medical Accountability Act of 2019, S.451, 116th Cong. (2019); *see* National Defense Authorization Act for Fiscal Year 2020, P.L. 116-92. at § 731 (2019) (codified at 10 U.S.C. § 2733a).

62. Despite the 2020 NDAA § 731 directing the Secretary of Defense to prescribe regulations to implement the section, and the 2020 NDAA passing on December 20th, 2019, the implementing regulations would not be prescribed until June 17th, 2021. Medical Malpractice Claims by Members of the Uniformed Services, 86 Fed. Reg. 32,194-32215 (June 17, 2021).

63. In a similar sign of the Defense Department's reticence to implement the program it was directed to by Congress, to Plaintiff's knowledge or belief it has never provided Congress the annual report it was directed to by 10 U.S.C. § 2733a(h) stating the number of claims processed and the resolution of the claims.

64. Plaintiff's initial application was denied via a cursory and boilerplate Initial Determination, dated January 24th, 2022, which merely stated that "Our investigation into your claim determined that the applicable standard of care was met." Exhibit 2, Initial Determination dated January 24th, 2022.

65. Plaintiff appealed this decision on February 17, 2022, in a submission package including the expert opinion of Dr. Wheeler, to the DHA appeals board, which, in a similarly cursory and boilerplate decision, adopted the Initial Determination on April 1st, 2022. Exhibit 3, Decision by the Defense Health Agency Military Medical Malpractice Claims Appeals Board dated April 1st, 2022.

66. Plaintiff's experience is not isolated.

67. Shockingly, SFC Richard Stayskal himself, the servicemember who inspired the act, has still not received a decision in his own claim against the government, despite having filed it more than two years ago. Diane Wilson, *Fort Bragg soldier still waiting for compensation for missed cancer diagnosis 2 years after new law*, ABC11.COM (December 24, 2021), https://abc11.com/richard-stayskal-law-military-medical-malpractice-ft-bragg/11381003/.

## ARGUMENT

I. **The Department of Defense's perfunctory dismissal of Plaintiff's claim was a violation of the Administrative Procedure Act, as it was without observance of procedure required by law. The boilerplate Initial Determination, adopted by the**

**DHA appeals board, was in violation of the Defendant's regulatory duty to provide a "brief explanation" sufficient to permit Plaintiff to meaningfully respond on appeal.**

68. The Administrative Procedure Act provides for judicial review of agency decisions made without observance of procedure required by law. 5 U.S.C. § 702(2)(D).

69. In *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) the Supreme Court mandated that agencies must follow their own regulations and binding guidance, even for decisions committed to discretion.

70. This established the *Accardi* doctrine, which permits the appeal, under the Administrative Procedure Act, of otherwise unreviewable agency decisions when the agency does not follow its own regulations. *See Montilla v. I.N.S.*, 926 F.2d 162, 166 (2nd Cir. 1991); *see Aracely R. v. Nielsen*, 319 F. Supp. 3d 110, 149-51 (D.D.C. 2018).

71. 32 C.F.R. § 45.12(d)(2) states that the Department of Defense must give a "brief explanation" explanation for the basis of the Initial Determination "to the extent practicable."

72. 32 C.F.R. § 45.13 grants claimants the right of appeal to Initial Determinations, with the requirement to explain why the claimant disagrees with the determination and the burden of proof being the preponderance of the evidence.

73. Plaintiffs can also be required to submit an expert opinion to substantiate their claim, though they are not required to do so when filing a claim. 32 C.F.R. § 45.12(c); *see* 32 C.F.R. § 45.4(d).

74. The regulatory structure created clearly requires that the Department of Defense provide an explanation which is at least sufficient to explain the grounds for denial of the claim, thus permitting the claimant to appeal the denial and to explain why the claimant disagrees with it. *See* 32 C.F.R. § 45.12(d)(2); *see* 32 C.F.R. § 45.13.

75. "Brief explanation" requires that an agency give more than just boilerplate language when rejecting a claim. *See Aracely R.*, 319 F. Supp. 3d at 153 fn. 27 (noting that the use of ICE of boilerplate language in rejecting certain parole claims was a failure by ICE to adhere to its regulatory procedural requirements to provide a "brief explanation.")

76. "To the extent practicable" does not lessen the Defense Health Agencies requirement to give a "brief explanation," as, in the context of the regulation, it clearly speaks to the potential limitations imposed by confidentiality requirements and privileged information. *See* 32 C.F.R. § 45.12(d)(2).

77. The boilerplate language used by the Defense Health Agency when rejecting Plaintiff's claim clearly violated its regulatory duties to provide a "brief explanation" sufficient to permit a

meaningful response by the Plaintiff. *See Aracely R.*, 319 F. Supp. 3d at 153 fn. 27; *see* 32 C.F.R. § 45.12(d)(2); *see* 32 C.F.R. § 45.13.

78. Claimants already alleged negligence by the very nature of submitting a claim, how can a claimant explain why the Initial Determination is incorrect if the determination gives no grounds to respond to? *See id.*

79. Nor do these recitations permit claimants' medical experts to examine or give a response to the determination.

80. In short, such recited responses make a mockery of the very regulatory structure the Department of Defense established when tardily implementing the SFC Richard Stayskal Act of 2019, as codified at 10 U.S.C. § 2733a.

81. The Defense Health Agency's cursory and boilerplate initial determination, adopted by the appeals board, was thus a violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(D) under the *Accardi* doctrine. *Accardi,* 347 U.S. at 260 *et seq.* (1954); *see* Montilla, 926 F.2d 162, 166 (2nd Cir. 1991); *see Aracely R.*, 319 F. Supp. 3d at 153 fn. 27.

82. The decision must thus be vacated and remanded to the Defense Health Agency for a new Initial Determination and appeals process. *See id.*

**II.     The Department of Defense's refusal to provide Plaintiff with the expert opinion it relied on was a violation of the Administrative Procedure Act, as it was without observance of procedure required by law.**

83. The Department of Defense's report within the Federal Register discussing the implementation of 10 U.S.C. § 2733a via its interim final rule explicitly encompassed the consideration of expert opinions when determining whether the standard of care was met by the military. 86 Fed. Reg. at 32201 (June 17, 2021) (...would be spent by DoD attorneys to analyze the claim, conduct legal research, *consult with experts*, and draft a determination) (emphasis added).

84. The statute explicitly tasks the Department of Defense with determining whether medical malpractice occurred, and also tasks the Department with reviewing the claims of malpractice under standards "consistent with generally accepted standards used in a majority of States." 10 U.S.C. § 2733a(f)(2)(B).

85. Determining whether medical malpractice occurred depends on determining if the standard of care was breached.

86. By necessary extension, this requires consultation with experts to determine what the standard of care is.

87. Failure to obtain expert advice as to the standard of care, or to have a preexisting report as to the type of procedure in question, would be a violation of the task Congress explicitly ordered the Department of Defense to perform. *See id.*

88. As stated above in Plaintiff's first claim, the Department of Defense has a statutory and regulatory duty to explain its decision in a matter which permits meaningful response on appeal.

89. This requires the provision of the expert opinion or advice used by the Department of Defense to establish the standard of care against which the Department measured the conduct of its employees.

90. Otherwise, Plaintiff would be completely unaware as to the Department's stance on what the standard of care in their respective matter was, and would be unable to meaningfully respond to it.

91. Thus, 5 U.S.C. 706(2)(D) also requires that the Department of Defense provide the expert opinion consulted when determining whether or not to approve a claim.

92. The failure by the Department of Defense to provide the expert opinion consulted when making its determination is also a violation of the clear statutory intent for the process to be transparent.

93. 10 U.S.C. § 2733a(h) demands that the Department of Defense provide an annual report to Congress detailing the resolution of each claim put before it.

94. These reports are clearly intended to reveal to the American people the process of the resolution of the malpractice claims pressed against the Department of Defense.

95. This clear statutory mandate for transparency extends to the resolution process of each claim as well.

96. How else can the public determine if the Department of Defense is granting meritorious claims, as statute requires it to do? 10 U.S.C. § 2733a(d)(1).

**Conclusion**

WHEREFORE, the Plaintiff humbly requests that this Court issue an order:

1) Holding that the Department of Defense's cursory and boilerplate Initial Determination was a violation of the DHA's requirement to provide a sufficient "brief explanation" in its determination;

2)  Vacating the Department of Defense's Initial Determination in Claim J210394, Mercedes Petitfere, as unlawful under the Administrative Procedure Act on the grounds that it was without observance of procedure required by law;

3)  Remanding this matter to the Defense Health Agency for a new Initial Determination, and potential Appeals process, in line with the Court's order;

4)  Granting all such other relief as it finds necessary and proper.

Plaintiff also signals her intent to file for attorney's fees and costs under the Equal Access to Justice Act.


Dated: June, 24th, 2022                              Respectfully submitted,

*/s/DavidP.Sheldon*

David P. Sheldon (DC Bar # 446039)
Law Offices of David P. Sheldon, P.L.L.C.
100 M. St. SE, Suite 600
Washington, DC 20003
Tel: 202.546.9575
Fax: 202.546.0135
*Attorney for Petitioner*